**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER, and RAY, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 12, 2014**

# In the Court of Appeals of Georgia

A13A2432. PAMPATTIWAR v. HINSON et al.

BARNES, Presiding Judge.

Vivek A. Pampattiwar hired Jan V. Hinson, Esq., and her law firm, Jan V. Hinson, P.C. (collectively, "Hinson") to file a divorce action on his behalf. Hinson ultimately terminated the representation and brought this action against Pampattiwar, alleging, among other things, that Pampattiwar had committed fraud by intentionally misleading Hinson during his initial consultation with her, and had published statements about her and her firm on the Internet that were libelous and placed her in a false light. Pampattiwar filed a motion to dismiss for failure to state a claim for fraud, which the trial court denied. The case proceeded to trial, and the jury returned a verdict in favor of Hinson on her claims for fraud, libel per se, and false light invasion of privacy. Pampattiwar filed motions for judgment notwithstanding the verdict and for new trial, which the trial court denied. Pampattiwar now appeals,

challenging the trial court's denial of his motions. For the reasons discussed below, we affirm.

"When we review the denial of a motion for new trial or judgment notwithstanding the verdict, we must affirm the denial if there is any evidence to support the verdict." *Wellons, Inc. v. Langboard, Inc.*, 315 Ga. App. 183, 187 (2) (726 SE2d 673) (2012). In making this determination, we construe the evidence and every inference arising therefrom in the light most favorable to the prevailing party. *Fletcher v. C.W. Matthews Contracting Co.*, 322 Ga. App. 751 (746 SE2d 230) (2013). "The determinative question is not whether the verdict and the judgment of the trial were merely authorized, but . . . whether a contrary judgment was demanded." (Citation and punctuation omitted.) *Wright v. Apartment Inv. & Mgmt. Co.*, 315 Ga. App. 587, 588 (726 SE2d 779) (2012).

Viewed in this manner, the evidence adduced at trial showed that on July 2, 2010, Pampattiwar met for an initial consultation with Hinson about filing for a divorce. Pampattiwar told Hinson that he was currently represented by other counsel and that he had filed a separate maintenance action against his wife in Fulton County

because both of them had lived there at the time the action was filed.[1] Although the separate maintenance action remained pending, Pampattiwar told Hinson that he now desired a divorce and that both he and his wife currently resided in Gwinnett County. Pampattiwar wanted Hinson to take over the representation of his case and file a petition for divorce on his behalf. He did not inform Hinson that she would be the sixth attorney to represent him in the litigation with his wife.

During the initial consultation, Hinson repeatedly asked Pampattiwar if his wife had filed a counterclaim for divorce in the separate maintenance action. Pampattiwar insisted that a divorce counterclaim had not been filed and invited Hinson to check the online Fulton County docket. Hinson then checked the docket while Pampattiwar watched, and the docket reflected that no divorce counterclaim had been filed. Pampattiwar had documents with him relating to the Fulton County case, but Hinson did not review them as part of the initial consultation.

---

[1] "Although an action for separate maintenance and an action for divorce both grow out of the marriage relationship and relate to the same subject matter, they have different purposes and raise different questions." *Southworth v. Southworth*, 265 Ga. 671, 673 (3) (461 SE2d 215) (1995). An action for separate maintenance is authorized "[w]hen spouses are living separately or in a bona fide state of separation and there is no action for divorce pending." OCGA § 19-6-10.

Hinson advised Pampattiwar that venue for the divorce would be in Gwinnett County given that both parties now lived there and that the filing of a divorce petition would abate the separate maintenance action. Hinson told Pampattiwar that she was willing to represent him in the divorce in Gwinnett County, but not in the separate maintenance action pending in Fulton County in which he already had retained counsel. Pampattiwar agreed to this arrangement, and Hinson subsequently filed a petition for divorce on his behalf in Gwinnett County.

Almost immediately after filing the divorce petition in Gwinnett County, Hinson received what she characterized as a "scathing" response from opposing counsel informing her that Pampattiwar's wife had in fact filed a counterclaim for divorce in the separate maintenance action almost a year earlier. Hinson confronted Pampattiwar, who assured her that he had not known about the divorce counterclaim or the error on the Fulton County docket. Pampattiwar also told Hinson that the attorney who had been representing him in the Fulton County case had now withdrawn and he was currently unrepresented. Believing that Pampattiwar had simply been confused about the filing of the counterclaim, Hinson agreed to represent him in the divorce proceedings in Fulton County.

After entering an appearance in the Fulton County action, Hinson obtained a copy of Pampattiwar's deposition that had been taken earlier in that case. It was clear from the deposition transcript that Pampattiwar knew that his wife had counterclaimed for divorce. Hinson confronted Pampattiwar with the deposition transcript and accused him of knowing about the counterclaim in their initial consultation. She accused him of "playing fast and loose with [her] bar license" and of "making a fool out of [her] in the courts in which [she] practice[d]" by having her file a divorce petition in Gwinnett County when one was already pending in Fulton County. Pampattiwar responded, "You can't get out now. We're on a trial calendar."

In light of the divorce counterclaim pending in Fulton County, Hinson advised Pampattiwar that the divorce petition filed in Gwinnett County was improper and would need to be voluntarily dismissed. Pampattiwar responded that he did not want to dismiss the Gwinnett County action and instead wanted to "take [his] chances" in Gwinnett and was "willing to pay extra for that." However, Hinson insisted that Pampattiwar agree to the dismissal or she would seek to withdraw from representing him. Pampattiwar then signed a dismissal drafted by Hinson, but he returned to her office after she left for lunch and took the document with him so that she could not file it. After another confrontation, Pampattiwar signed a new dismissal drafted by

5

Hinson, which she was able to file successfully. The divorce petition filed in Gwinnett County ultimately was dismissed while the divorce case proceeded in Fulton County.

Over the ensuing months, Hinson and Pampattiwar had multiple heated confrontations over billing issues and other matters relating to the Fulton County divorce case. Hinson moved to withdraw from representing Pampattiwar, but the trial court denied her motion. Hinson later filed a motion for reconsideration, which the trial court granted on the eve of arbitration that had been scheduled between Pampattiwar and his wife. However, Pampattiwar pleaded with Hinson to represent him in the arbitration that was set to commence in three days, and she acquiesced to his request.

Hinson ended her representation of Pampattiwar on September 15, 2010 after the arbitration. In October 2010, Pampattiwar contacted Hinson's law firm because he was upset over his legal bills. Pampattiwar spoke with a paralegal at the firm and accused Hinson and her staff of being "crooks" and claimed that they had "duped" him.

In November 2010, Hinson became concerned because "the phones just stopped ringing" in her office. One of Hinson's assistants "Googled" Hinson's name

6

on the Internet and discovered a review of her law firm that had recently been posted on the website Kudzu.com under the screen name "STAREA." The reviewer described Hinson as "a CROOK Lawyer" and an "Extremely Fraudulent Lady." The reviewer claimed that Hinson "inflates her bills by 10 times" and had "duped 12 people i[n] the last couple of years." Further investigation revealed that the Internet protocol ("IP") address used for the STAREA review matched the IP address used by Pampattiwar in several emails that he had sent to Hinson.

Hinson subsequently filed the instant action against Pampattiwar, alleging, among other things, that he had published statements about her and her firm on Kudzu.com that constituted libel per se. Hinson also alleged that Pampattiwar had committed fraud during his initial consultation with her by falsely representing that no divorce counterclaim had been filed in the Fulton County case and by encouraging her to confirm this fact on the online docket, even though Pampattiwar knew that his wife had filed a counterclaim and that the docket was inaccurate. Hinson further alleged that she detrimentally relied on Pampattiwar's misrepresentation about the counterclaim by improperly filing a petition for divorce on his behalf in Gwinnett County, leading her to suffer professional embarrassment and humiliation.

7

After Hinson filed her lawsuit, an additional review was posted on Kudzu.com under the screen name "REALPOLICE." The reviewer warned viewers not to "trust" positive reviews appearing for Hinson on Kudzu.com because she "asks her office staff to post bogus reviews every where on the [I]nternet." Further investigation revealed that the Kudzu.com user accounts for STAREA and REALPOLICE had the same password, "pampa012." As with the STAREA review, the IP address used for the REALPOLICE review matched the IP address used by Pampattiwar in his emails with Hinson. After the posting of the REALPOLICE review, Hinson amended her complaint to include a claim for false light invasion of privacy.

Pampattiwar filed a motion to dismiss Hinson's fraud claim for failure to state a claim upon which relief could be granted, and the trial court denied the motion. The case proceeded to trial, where Hinson testified to the events as set out above. Hinson called several additional witnesses, including an information technology ("IT") communications expert who traced the source of the two Kudzu.com reviews to the IP address associated with Pampattiwar. On her claims for fraud, libel per se, and false light invasion of privacy, Hinson did not assert that she suffered any pecuniary

8

loss from the misrepresentations and instead sought damages for "wounded feelings" under OCGA § 51-12-6.[2]

Pampattiwar moved for a directed verdict on several of Hinson's claims, which the trial court denied. During the defense's case-in-chief, Pampattiwar testified that he had been aware that his wife had filed a counterclaim for divorce in the separate maintenance action in Fulton County when he met for his initial consultation with Hinson. But Pampattiwar claimed that he told Hinson about the counterclaim and showed her pleadings from the Fulton County case during the initial consultation. Pampattiwar also denied posting the two reviews on Kudzu.com.

After hearing all of the evidence, the jury found in favor of Hinson and, among other things, awarded her damages for fraud, libel per se, and false light invasion of privacy using a special verdict form. Pampattiwar filed motions for judgment notwithstanding the verdict and for new trial, which the trial court denied. This appeal followed.

---

[2] OCGA § 51-12-6, entitled "Damages for injury to peace, happiness, or feelings," provides in relevant part: "In a tort action in which the entire injury is to the peace, happiness, or feelings of the plaintiff, no measure of damages can be prescribed except the enlightened consciences of impartial jurors."

1. Pampattiwar contends that the trial court erred in denying his motion for judgment notwithstanding the verdict on Hinson's claim for fraud predicated on his alleged misrepresentation about the divorce counterclaim because Hinson failed to prove justifiable reliance. Hinson testified that she checked the online docket in the Fulton County action to confirm Pampattiwar's statement that no divorce counterclaim had been filed in that action, but Pampattiwar contends that checking the docket was insufficient due diligence on her part. According to Pampattiwar, Hinson should have investigated further into what claims were being asserted in the Fulton County action before she filed the divorce petition in Gwinnett County, such as by reviewing the documents from the Fulton County action that Pampattiwar brought with him to the initial consultation. We are unpersuaded that the evidence *demanded* a finding in favor of Pampattiwar on the issue of reasonable reliance.

"One of the essential elements of an action for fraud is justifiable reliance by the plaintiff." (Citation and punctuation omitted.) *Bithoney v. Fulton-DeKalb Hosp. Auth.*, 313 Ga. App. 335, 344 (2), n. 23 (721 SE2d 577) (2011). "Blind reliance precludes a fraud claim as a matter of law." *Baxter v. Fairfield Fin. Svcs.*, 307 Ga. App. 286, 294-295 (4) (704 SE2d 423) (2010). But

[w]hile a party must exercise reasonable diligence to protect himself against the fraud of another, he is not bound to exhaust all means at his command to ascertain the truth before relying upon the representations. Ordinarily the question whether the complaining party could have ascertained the falsity of the representations by proper diligence is for determination by the jury.

*Elliott v. Marshall*, 179 Ga. 639, 640 (176 SE 70) (1934). See *Morgan v. Morgan*, 193 Ga. App. 302, 304-305 (5) (388 SE2d 2) (1989); *Adkins v. Lee*, 127 Ga. App. 261, 264 (4) (193 SE2d 252) (1972).

In the present case, Hinson testified that she had practiced domestic law for 16 years and had performed civil case searches on the online Fulton County docket for "hundreds" of cases. Hinson testified that based on her experience, the online docket normally would reflect that a divorce counterclaim had been filed in a domestic case in the pleadings index and in the description of the case type. According to Hinson, she relied on the online docket as confirmation of what Pampattiwar had told her about the Fulton County case because the docket "always" listed "answer and counterclaim" in the pleadings index and listed "divorce" as the case type if a divorce counterclaim had been filed, but here the docket listed the responsive pleading simply as "answer" and the case type as "separate maintenance action." Hinson further

11

testified that she declined to review the documents from the Fulton County case that Pampattiwar brought with him to the initial consultation because Pampattiwar already had counsel representing him in that case and she did not want to become involved in the separate maintenance action, which she had believed would be dismissed upon the filing of the divorce petition in Gwinnett County. Hinson also noted that while clients in domestic cases are stressed and sometimes are forgetful, they do not usually forget that they are "going through a divorce," and she does not "typically assume that a client is lying" to her about such a basic fact.

In light of this testimony, it was for the jury to determine whether Hinson exercised sufficient due diligence by checking the online docket to confirm Pampattiwar's statement that his wife had not filed a counterclaim for divorce in the Fulton County case. "Justifiable reliance generally is a question for the jury, and jury resolution [was] necessary here." *Catrett v. Landmark Dodge, Inc.*, 253 Ga. App. 639, 641 (1) (560 SE2d 101) (2002). The trial court therefore did not err in denying Pampattiwar's motion for judgment notwithstanding the verdict on Hinson's fraud claim. See *Johnson v. GAPVT Motors, Inc.*, 292 Ga. App. 79, 83 (1) (663 SE2d 779) (2008) (although the evidence would have "*authorized*" the jury to find that plaintiff should have discovered the alleged misrepresentation, "this conclusion was not

12

*demanded* by the evidence") (emphasis in original). See also *Catrett*, 253 Ga. App. at 641 (1) (whether plaintiff reasonably relied upon defendant's misrepresentation that the car was "new" should be submitted to the jury, where plaintiff relied upon documents reflecting that the car was "new," but there were other documents available that referred to the car as "used"); *Parks v. Howard*, 197 Ga. App. 405, 407-408 (4) (398 SE2d 308) (1990) (whether plaintiff exercised due diligence by relying upon the inspection report presented by defendant, or whether plaintiff should have obtained an independent inspection report, was for the jury to resolve).

Pampattiwar's reliance upon *Isbell v. Credit Nation Lending Svc., LLC*, 319 Ga. App. 19, 25-26 (2) (b) (735 SE2d 46) (2012), is unpersuasive. In *Isbell*, the buyers of a used truck asserted fraud claims against the seller and the seller's financier, contending that the condition of the truck had been misrepresented to them. Id. at 19-21. The uncontroverted evidence showed that the buyers failed to obtain a vehicle history report or have their own mechanic inspect the truck even though they "were specifically warned that the vehicle may have a bent frame" and were offered an opportunity to have the truck inspected. Id. at 26 (2) (b). Consequently, we concluded that, as a matter of law, the buyers had failed to exercise due diligence to discover that the used truck had suffered frame damage in a prior automobile

13

accident. Id. We reasoned that the buyers' "blind reliance on the salesman's representations when the means of knowledge were at hand show[ed] an unjustified lack of due diligence." (Citation and punctuation omitted.) Id.

Relying on *Isbell*, Pampattiwar argues that Hinson ignored the documents from the Fulton County case that he brought with him to the initial consultation and thus blindly relied on his representation that there was no divorce counterclaim "when the means of knowledge were at hand." Notably, however, the plaintiff buyers in *Isbell* were put on notice that there might be a defect in the used truck that they were purchasing, but nevertheless failed to take additional steps to determine if a defect existed that were readily available to them. See *Isbell*, 319 Ga. App. at 26 (2) (b). But Hinson was never put on notice that a divorce counterclaim might have been filed in the Fulton Case; to the contrary, the online docket reviewed by Hinson reflected that no such counterclaim had been filed and thus appeared to confirm Pampattiwar's representation to her. Hence, unlike in *Isbell*, this is not a case of "blind reliance." Under these circumstances, it was for the jury to resolve whether Hinson should have

reviewed the documents that Pampattiwar brought to the initial consultation before filing the divorce petition in Gwinnett County.[3]

2. Pampattiwar also contends that the trial court erred in denying his motion for new trial on Hinson's fraud claim because she failed to show "actual damages" resulting from the alleged misrepresentation about the divorce counterclaim. Hinson did not allege that she suffered any pecuniary losses from improperly filing the divorce petition in Gwinnett County in reliance on Pampattiwar's misrepresentation about the counterclaim. Rather, Hinson alleged that the entire injury she suffered from the misfiling of the divorce petition was to her peace, happiness, and feelings and sought damages pursuant to OCGA § 51-12-6. According to Pampattiwar, damages for "wounded feelings" under OCGA § 51-12-6 are not "actual damages" and thus could not be recovered by Hinson for her fraud claim. We disagree.

---

[3] Pampattiwar separately contends that the trial court erred in denying his motion to dismiss Hinson's fraud claim for failure to state a claim upon which relief could be granted. In moving to dismiss the fraud claim, Pampattiwar argued that the element of reasonable reliance had not been pled with sufficient particularity in Hinson's complaint. See OCGA § 9-11-9 (b). "However, the proper remedy for seeking more particularity is by motion for a more definite statement at the pleading stage or by the rules of discovery thereafter." (Citation and punctuation omitted.) *Odom v. Hughes*, 293 Ga. 447, 455 (3), n. 6 (748 SE2d 839) (2013). Accordingly, the trial court committed no error in denying Pampattiwar's motion to dismiss. See id.; *Miller v. Lomax*, 266 Ga. App. 93, 98 (2) (b) (596 SE2d 232) (2004).

As we have recently reiterated,

> In order to recover for fraud, a plaintiff must prove that actual damages, not simply nominal damages, flowed from the fraud alleged. The expression "actual damages" is not necessarily limited to pecuniary loss, or loss of ability to earn money. General damages are those which the law presumes to flow from any tortious act, and they may be awarded on a fraud claim. Wounding a man's feelings is as much *actual damage* as breaking his limbs. Injury to reputation is a personal injury, and personal injury damages can be recovered in a fraud action.

(Emphasis in original.) *Kelley v. Cooper*, __ Ga. App. __ (4) (c) (Case No. A13A0982, decided Nov. 22, 2013), quoting *Zieve v. Hairston*, 266 Ga. App. 753, 759 (2) (c) (598 SE2d 25) (2004). See also *Johnson*, 292 Ga. App. at 83 (1). Thus, we have held that recovery for "wounded feelings" under OCGA § 51-12-6 is permitted for fraudulent misrepresentation where, as here, the plaintiff claims that the entire injury she suffered from the misrepresentation was to her peace, happiness, or feelings. See *Mallard v. Jenkins*, 186 Ga. App. 167, 168 (1) (366 SE2d 775) (1988). Compare *Kent v. White*, 238 Ga. App. 792, 794 (1) (c) (520 SE2d 481) (1999) (plaintiff could not recover damages under OCGA § 51-12-6 for fraud because "at no point did [the plaintiff] claim that the entire injury to him was to his peace, happiness, or feelings"). It follows that the trial court did not err in determining that Hinson

16

could recover damages under OCGA § 51-12-6 on her fraud claim and in denying Pampattiwar's motion for new trial.

3. As with Hinson's fraud claim, Pampattiwar contends that the trial court erred in denying his motion for new trial on Hinson's claim for libel per se because Hinson could not recover "wounded feelings" damages under OCGA § 51-12-6 for the alleged defamatory statements. In this regard, Pampattiwar notes that the trial court ruled before trial that Hinson could not recover punitive damages on her libel claim because she never made a written request for correction or retraction of the defamatory statements before filing her complaint. See OCGA § 51-5-11; *Mathis v. Cannon*, 276 Ga. 16, 28 (4) (573 SE2d 376) (2002). In light of the failure to request retraction, Pampattiwar argues that OCGA § 51-12-6 damages could not be recovered on Hinson's libel claim because the damages awarded under that statute are in part punitive. We again disagree.

It is true that before the passage of the Tort Reform Act of 1987 (the "Act"), Ga. L. 1987, p. 915, § 6, "wounded feelings" damages awarded under OCGA § 51-12-6 were in part punitive because the statute authorized the jury to consider "circumstances relevant to deterrence of the wrongdoer." *Westview Cemetary v.*

17

*Blanchard*, 234 Ga. 540, 546 (2) (B) (216 SE2d 776) (1975). Specifically, the pre-1987 version of OCGA § 51-12-6 stated:

> In a tort action in which the entire injury is to the peace, happiness, or feelings of the plaintiff, no measure of damages can be prescribed except the enlightened consciences of impartial jurors. In such a case, the *worldly circumstances of the parties, the amount of bad faith in the transaction*, and all the attendant facts should be weighed; and the verdict of the jury should not be disturbed unless the court suspects bias or prejudice from its excess or its inadequacy.

(Emphasis supplied.) Because the statute allowed for consideration of all the attendant circumstances, including the "worldly circumstances of the parties" and any "bad faith in the transaction," "the jury [was] not restricted to consideration of circumstances relevant to compensation (i.e., the extent of the injury) but [was] entitled to consider as well circumstances relevant to deterrence (i.e., any aggravated aspects of the defendant's misconduct plus the defendant's 'worldly circumstances')." *Westview Cemetary*, 234 Ga. at 545 (2) (B). As such, damages under the pre-1987 version of OCGA § 51-12-6 were, "at least in part, punitive damages." Id.

However, the 1987 Act significantly revised OCGA § 51-12-6, as our Supreme Court recently explained:

In the Act, the General Assembly . . . enacted the current version of OCGA § 51-12-6, and deleted from the pre-1987 statute the language: "the worldly circumstances of the parties, the amount of bad faith in the transaction, and all the attendant facts should be weighed." In its place, the legislature inserted the text: "In such an action, punitive damages under Code Section 51-12-5 or Code Section 51-12-5.1 shall not be awarded." And, the General Assembly specifically encompassed within the term "punitive damages" those damages that might be "awarded . . . in order to . . . deter a defendant." OCGA § 51-12-5.1 (a). Thus, the General Assembly eliminated from OCGA § 51-12-6 the language that was intended to deter misconduct . . . .

*Holland v. Caviness*, 292 Ga. 332, 334-335 (737 SE2d 669) (2013). Given the elimination of the statutory language aimed at deterrence, the current version of OCGA § 51-12-6, applicable in the present case, does not contain "a punitive award provision." Id. at 335, n.8. Consequently, Pampattiwar's argument that OCGA § 51-12-6 damages could not be recovered for Hinson's libel claim because of the failure to request retraction is misplaced because it is predicated on an obsolete version of the statute.

We are cognizant that the trial court charged the jury on OCGA § 51-12-6 damages using language from the Georgia pattern jury instructions, which still includes reference to the "worldly circumstances of the parties" and "the amount of

19

bad faith in the transaction" even though that language was deleted from the statute in 1987. See Suggested Pattern Jury Instructions, Vol. I: Civil Cases, § 66.600. Our Supreme Court has noted that "the jury should no longer be instructed using that language." See *Holland*, 292 Ga. at 333, n. 3. Notably, however, in his reply brief, Pampattiwar concedes that he did not properly object to the charge at trial and expressly states that he is not claiming that the giving of the charge constituted "a substantial error . . . which was harmful as a matter of law" even absent objection. OCGA § 5-5-24 (c). Pampattiwar emphasizes that "he does not challenge any charge" on appeal and instead argues more broadly that "section 51-12-6 damages inherently incorporate punitive damages" and thus could not be awarded in this case as a matter of law in light of Hinson's failure to seek retraction. Under these circumstances, Pampattiwar has abandoned any possible challenge to the jury charge on OCGA § 51-12-6 damages, and his broader argument regarding OCGA § 51-12-6 and retraction fails for the reasons previously discussed. The trial court therefore committed no error in denying Pampattiwar's motion for new trial on the libel claim.

4. Lastly, Pampattiwar contends that the trial court erred in denying his motion for new trial on Hinson's claim for "false light" invasion of privacy. Pampattiwar argues that Hinson's false light claim was predicated on the second review on

20

Kudzu.com submitted under the screen name "REALPOLICE," and he contends that it was undisputed by the parties at trial that the review was flagged and rejected by Kudzu.com for violating its internal policy guidelines before the review was ever posted for the general public to see on the Internet. Given that the second review allegedly was never posted on the Internet, Pampattiwar asserts that Hinson failed to prove that the review was distributed to the public at large and thus could not establish the essential element of publicity as a matter of law. See *Williams v. Cobb County Farm Bureau*, 312 Ga. App. 350, 354 (2) (b) (718 SE2d 540) (2011); *Assn. Svcs., Inc. v. Smith*, 249 Ga. App. 629, 633-634 (4) (549 SE2d 454) (2001). We disagree.

Although Pampattiwar asserts that it was undisputed at trial that the second Kudzu.com review was never posted on the Internet, he cites to nothing in the record to support his assertion. And the record reflects that during closing argument, counsel for Hinson in fact argued that Pampattiwar twice posted reviews to the Internet:

> And this claim [of] putting this on the Internet not once, understand, not once but twice. Once wasn't good enough. He had to do it again. Each time she saw this, each time she was subjected to seeing this on Kudzu and then having to go to Kudzu and have them take it down . . . and then to see it pop back up again, you know, that caused injury to her peace, happiness, and feelings.

21

Thus, from the jury's perspective, the issue of whether the second Kudzu.com review was posted on the Internet was in dispute.

Furthermore, there was at least some evidence from which the jury could find that the second review was posted on the Internet. Business records from Kudzu.com were admitted at trial that included a screen shot of the second review and a notation that the review was "Posted: 4/19/2011." When asked what the date beside the word "Posted" field signified on these business records, the employee who handled site operations for Kudzu.com testified that it reflects "[t]he date the review was posted. Posted meaning you can view it on Kudzu.com" When all inferences are interpreted in the light most favorable to the verdict, the jury could have inferred from the Kudzu.com business records and the employee's testimony that the second review submitted under the user name "REALPOLICE" was posted to the Internet for the general public to see. Because there was evidence from which the jury could find that the element of publicity had been met, the trial court committed no error in denying Pampattiwar's motion for new trial on Hinson's claim for false light invasion of privacy.

*Judgment affirmed. Miller, J. concurs. Ray, J., concurs in Divisions 1, 2, and 4, and concurs in the judgment only as to Division 3.*